# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

DR. HONGJIN SUI, and
DALIAN HOFFEN BIO-TECHNIQUE
CO., LTD.,

        Plaintiffs,

v.                            CASE NO.:  8-11cv-00037-SDM-TBM

HARRY WU and THE LAOGAI
RESEARCH FOUNDATION,

        Defendants.

_____/

## PLAINTIFFS' SUBSTITUTED RESPONSE TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT[1]

Plaintiffs, Dr. Hongjin Sui ("Sui") and Dalian Hoffen Bio-Technique Co. Ltd. ("DHBC") (collectively hereafter as "Dr. Sui"), respond to Defendant Harry Wu ("Wu") and Laogai Research Foundation's ("Laogai") (collectively hereafter as "Wu") Motion to Dismiss [Dkt. 18] Plaintiffs' Amended Complaint [Dkt. 14] (the "Am. Comp."), as follows:

## I.     OVERVIEW.

Dr. Sui filed this lawsuit against Wu for defamation, libel and slander (Count I), tortuous interference with his business relationships (Count II) and for equitable relief (Count III).  Wu is a joint tortfeasor with Gunther von Hagens ("von Hagens"), and together, Wu and von Hagens have published false information about Dr. Sui to injure Dr. Sui's reputation and business. (Am. Comp. ¶8).  Dr. Sui and Arnie Geller, a Florida resident ("Geller"), have sued von Hagens and his companies in this Court for libel, for making the same and similar false statements that are alleged by Dr. Sui here.  The von Hagens case is pending in this Court as Case No.: 08:10-cv-01688-EAK-

---

[1] Plaintiffs' original response was 25 pages and exceeded the 20 page rule on response briefs.  This substituted brief meets this requirement.  Plaintiffs ask that this court substitute this response for document 21 filed March 3, 2011.

AEP (the "von Hagens case"). (Id, ¶8).[2]

Wu met with von Hagens in 2007, and von Hagens gave Wu nine photographs of executed

Chinese prisoners lying in the snow in Jilin, China.  von Hagens told Wu that Dr. Sui had purchased

these bodies in the "body black market" and was displaying the bodies of executed prisoners in his

exhibitions. (Id. ¶¶9, 10, 19, 20).  Using these pictures, Wu launched a campaign to discredit Dr.

Sui and his business.  Wu has moved this court to dismiss under Rule 12(b)(2) and (6) contending

that this Court has no personal jurisdiction over him and that Dr. Sui has not stated a viable cause of

action.  As will be shown below, Wu has sufficient contacts with the state of Florida for this Court

to exercise jurisdiction over him, and Dr. Sui has sufficiently pled a cause of action.

## II.   ARGUMENT AND CITATION OF AUTHORITY.

### A.   Personal Jurisdiction and Florida's Long Arm Statute.

A federal district court sitting in diversity "may exercise personal jurisdiction to the extent

authorized by the law of the state in which it sits and to the extent allowed under the Constitution."

Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino, 447 F.3d 1357, 1360 (11th Cir. 2006).

Section 48.193(1), Florida Statutes, provides, in pertinent part, that:

> (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself ... to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
>
>> (a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
>>
>> (b) Committing a tortious act within this state.

"Where a defendant is found to have undertaken one of the acts enumerated in Florida

Statute Section 48.193(1), and the cause of action arises from or relates to that act, the long-arm

---

[2] Dr. Sui will move to have this case and the von Hagens case consolidated, as the two cases are inextricably intertwined.  Common questions of law and fact require that the two cases be tried together.

statute has been met." See Smith v. Trans-Siberian Orchestra, 728 F.Supp.2d 1315, 1320 (M.D. Fla. 2010).

### 1.   Wu's Contacts With the State of Florida Are Substantial.

Wu and Laogai have a website on the World Wide Web accessible at www.laogai.org (the "Website") (Am. Comp. ¶5, Ex. 2).  The website is accessible in the State of Florida and has been accessed in the State of Florida by its citizens. (Geller Declaration, ¶4).  The Website is interactive as it allows members to "login" and access information which can be sent immediately to a recipient's computer, cell phone or other portable devise. (Am. Comp. ¶7, Ex. 2).  The Website is offered in English, Chinese and Italian. (Id).  Wu uses the Website to solicit funds from everyone who has access to the world wide web. (Id).  The Website offers Wu's books and publications for sale and contains features for blogs (interactive writing from participants), news, press releases, archives, and access to the Laogai museum. (Id.).  The Website is designed to reach and does reach citizens all over the world, including the State of Florida.

As a purported world famous Chinese human rights activist, Wu's Website is his primary means for:  (1) raising money for Laogia, and: (2) asserting his agenda and attacking those like Dr. Sui, who Wu believes do not conform to his beliefs.  Indeed, it appears that Wu's published articles defaming Dr. Sui (Am. Comp. Ex. 4) and his participation as a source to the ABC 20/20 program which aired on February 15, 2008 (Id. ¶27) were quite profitable for Laogai.  In Laogai's fiscal year October 1, 2007 to September 30, 2008, Laogai received "public support" contributions of $18,314,748. (See Laogai 2007 tax return, p. 1, Exhibit 1 to this Brief).[3]  The Plaintiffs have served discovery on Wu requesting information on Laogai's donors.[4]  Based upon the extremely large

---

[3] Prior years "direct public support" contributions fail to compare.  In 2006, Laogai received $22,515 in direct public support.  In 2005, public support was $9,604, in 2004, $2,465, in 2003, $6,284, and in 2002, direct public support was $12,358.  The Laogai tax returns for 2002-2005 (without schedules) are filed with this brief as Exhibits 2 through 6.

[4] Plaintiffs (Dr. Sui and Geller) in the von Hagens case served Wu and Laogai with subpoenas on January 28, 2011 to produce documents identifying donors to Laogai from the von Hagens Defendants, and donors to Laogai from

donation(s) made the year of the 20/20 program, as well as the expansive reach of Wu's website, discovery may show that donations were received from Florida residents, or perhaps from the von Hagens Defendants.

Wu has used his Website to libel Dr. Sui. (Am. Comp. ¶¶ 16 -22).  Specifically, Wu published an article on July 12, 2010 on the Website (Am. Comp., Ex. 3) which made numerous false and libelous statements about Dr. Sui.  The article is designed to mislead the reader into believing that the specimens used by Dr. Sui are persons who have been tortured, executed, or otherwise mistreated.  The article makes a number of false and misleading statements.  For example, the article accuses Dr. Sui of stealing or misappropriating the plastination process as follows:  "After plagiarizing the technique, Sui carried out the process on biological specimens in China and began enlightening and educating audiences through exhibitions all over the world."  Dr. Sui did not "plagiarize" the plastination technique, but rather has every legal right to perform plastination of specimens.  The article also states:  "Even more disturbing, there is increasing evidence to suggest that many of these bodies may in fact be those of executed Chinese prisoners whose ability to give genuine consent is highly dubious."  This statement is false.  There is no evidence to suggest that Dr. Sui and his companies have plasticized any executed Chinese prisoner, and in fact, they did not do so.  The article also contains pictures at pages seven and eight showing four executed Chinese citizens, face down in the snow, hands bound behind them with blood flowing from their heads.  One picture contains the caption, "Bodies of executed prisoners delivered to a plastination factory in Jilin, China.  The anonymous source of these photographs also claimed

---

Florida residents. (See Exhibit 7).  Wu has objected to producing any donor information from Florida residents in the von Hagens case, apparently for fear that the information would be used here to support Dr. Sui's response on jurisdiction.  Thus, Dr. Sui served a request for documents on Wu on February 22, 2011 in this case, requesting donor information from Florida residents. (See Exhibit 8).  Discovery on jurisdictional issues is appropriate, and Dr. Sui requests the opportunity to conduct further jurisdictional discovery if this Court determines that evidence of additional contacts with Florida is necessary to maintain jurisdiction.  For an excellent opinion discussing and granting jurisdictional discovery, see Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC, 2008 WL 1771857 (S.D. Fla. 2008).

to have delivered bodies to Premier's supplier [Dr. Sui] in Dalian, China."  The article appears in the section of the article, "Case Study – Dalian Hoffen Biotechnique – Premier Exhibitions."  These bodies were never delivered to Dr. Sui.  Since the publishing of this article on July 12, 2010, the source for the proposition that Dr. Sui uses executed prisoners has given a deposition in Hong Kong in the von Hagens case, refuting any such suggestion.[5]  It is now known that von Hagens instructed his former employee, Deqiang Sun ("Sun"), to defame Dr. Sui by falsely reporting to ABC News ("ABC") that Dr. Sui uses the bodies of executed Chinese prisoners in Premier's display, "Bodies … The Exhibition."[6]  von Hagens instructed Sun to relay this false information to ABC, knowing that it would be broadcast nationwide, for the specific purpose of attempting to obliterate von Hagens' competition.  Wu was a participant in the ABC 20/20 program. (Am. Comp. ¶27).  Wu gave the nine photographs (received from von Hagens) to ABC.  Like von Hagens, Wu knew that the 20/20 program was to be aired nationwide, and that his "agenda" would be furthered by the 20/20 program.  Moreover, Wu knew, or should have known, that injury would occur in Florida from ABC's 20/20 investigative report, in which he participated.  The report aired while Premier's "Bodies … the Exhibition" was on display in Fort Lauderdale, Florida.[7]  Wu and von Hagens used the 20/20 broadcast as an opportunity to further their own agendas.  Wu wanted to expose Dr. Sui to the U.S. and the world as a man who had stolen the rights to plastination [allegedly from von

---

[5] The relevant pages of the deposition of Deqiang Sun ("Sun") are attached as Exhibit 9.  Wu's counsel was invited to attend the deposition, but elected not to do so.  Subsequently,  the transcript was provided to Wu and his counsel.  One of the primary reasons that Sun agreed to testify was because Wu was wrongfully using his photographs to attack China, and Sun felt that this was wrong. (Exhibit 9, p. 72).

[6] Sun testified that he was a former employee of von Hagens, and that during his employment, von Hagens instructed him to tell ABC News reporters that he took photos of executed Chinese prisoners, which were used in Dr. Sui's American exhibit. (Ex. 9, pp. 26, 39-42, 69-72 ).  These are the same pictures that von Hagens gave to Wu, which Wu gave to ABC, and which were used by Wu in his July 12, 2010 article to defame Dr. Sui.  At the deposition, Sun made it clear that he never worked for Dr. Sui, the photographed bodies were never purchased by anyone or used in any exhibits, and the statements he made to ABC were not true. (Exhibit 9 pp. 37, 66, 69-72).

[7] "Bodies . . . The Exhibition" [Dr. Sui's specimens] was on display in Fort Lauderdale, Florida from November 2007 through April 2008; the ABC 20/20 broadcast in which Wu acted as a source and containing Sun's false statements regarding executed prisoners aired on February 15, 2008.

Hagens] and was illegally purchasing executed prisoners in a Chinese body black market, and making millions of dollars in the United States.  Wu hoped to draw attention to Laogai and his alleged human rights cause, which according to the amount of public contributions received by Laogia prior to 2007, was of little public interest.[8]  von Hagens intended to damage the attendance of "Bodies ….The Exhibition" in Fort Lauderdale, while he promoted his own BODY WORLDS exhibition, which was scheduled to open less than eleven months later – on January 22, 2009, in Tampa, Florida.  The only question for this Court is whether these contacts are sufficient to satisfy the Florida Long Arm Statute and the due process requirements.

### 2.   The Requirements of the Florida Long Arm Statute Have Been Satisfied.

Internet Solutions Corp. v. Marshall, 39 So. 3d 1201 (Fla. 2010) is the most recent review by the Florida Supreme Court of the Florida Long Arm Statute.  The court found jurisdiction over Marshall based on the following contacts.  Wu's contacts are shown here by comparison.[9]

| Defendant Marshall's Contentions | Harry Wu's Contentions |
|---|---|
| Resident of Washington since 2000 -- never been a resident of Florida | Resident of Virginia, never a resident of Florida |
| Never owned or leased any real estate in Florida | Does not own property in Florida |
| No bank accounts or investments in Florida | Unknown |
| Only visited Florida once-a three-day work-related trip in 2004 that was unconnected with her website | Visited Florida once for vacation. |
| Owner and host of the website from her home in Washington | Presumably the Website is administered in Virginia or Washington, D.C. (Laogai's location) |
| Never sold any products or services in connection with the website | Products (books, post cards, publications) available for sale from Wu's website (Am. Comp., Ex. 2) |
| Never placed any advertisements on the website | Advertises Wu's own products |
| Never solicited or received any business, | Solicits money and memberships from all who |

---

[8] Given the $18,314,748 in public donations that Wu received the year the ABC show aired, it appears that he was successful.

[9] Wu's affidavit is not made on personal knowledge.  It also states the legal conclusion that, "I have not conducted business myself or on behalf of LRF in Florida." (Wu Aff., ¶4).  Nevertheless, the affidavit, does not eliminate the possibility that other Laogai agents have been to Florida to advance its agenda.  In fact, Wu notes in his article "Bodies on Display" (Am. Comp., Ex. 3) that Florida Representative Victor Crist introduced SB No. 2254 in 2007 concerning the display of dead human bodies.  Laogai has shown a strong interest in advocating for legislation to stop Dr. Sui's exhibits. (See Am. Comp., Ex. 3, p. 12).  Dr. Sui seeks discovery on whether other Laogai representatives have been to Florida to advance this legislation. (Exhibit 8).

| | |
|---|---|
| advertising, or donations within Florida | can access the internet. (Discovery requested on donations from Florida residents) |
| Never contracted with an Internet service provider located within Florida | Unknown |
| Never provided a capability on the website to distinguish or target Florida individuals or companies | Members and non-members may login and blog on Website, may respond to membership requests and may identify themselves.  One person is shown on Ex. 2 in the membership section, (Miriam Weiss) from Cleveland, Ohio. |
| Never received any income or compensation in connection with the website | In 2008, Laogai received $18,314,748 in public donations, but sources are unknown.  Website specifically seeks donations with specific designations for levels of giving (Discovery requested on donation sources) |
| Never directed any communication (telephonic or written) into Florida for business purposes in connection with the website | Unknown |

Wu is certainly more connected with the State of Florida than was Marshall in Internet Solutions, where jurisdiction was found.  Wu has an interactive internet site that sells products, solicits memberships, and seeks financial contributions.  Whether Wu raises funds to support Laogai is directly related to the controversial nature of the articles he publishes on his Website.  In 2008 Wu hit the jackpot with his attack on Dr. Sui and the Body Exhibits, seizing on false information given to him by von Hagens, and taking that information to ABC and the internet via his Website.  His results show in the "bottom line" of his private donations for 2008.  Thus, notwithstanding his contentions to the contrary, the cause of action against Wu does arise from the actions on his interactive Website, because he uses his defamatory articles to invoke his emotional readers into joining and donating to his cause.  Thus, it would be inappropriate to separate his libelous articles from the interactive aspect of selling his books and articles (which also promote his agenda) and his fund raising efforts.

In Internet Solutions, the Florida Supreme Court held that the posting of defamatory material on a website does not constitute the commission of a tort unless it is accessible and accessed in Florida. Internet Solutions, at p. 1203.  Although the court in Internet Solutions refers to "Florida resident," on a number of occasions, the certified questions do not.  Each question refers to

"a company with its principal place of business in Florida." The difference is important. Wu would have this court dismiss Internet Solutions as non-controlling by the mere showing that Dr. Sui is not a Florida resident. Certainly Dr. Sui is not a Florida resident, but the plaintiffs are not residents of any of the United States.[10] The holding in Internet Solutions, however, does not turn on the issue of the residency of the plaintiff, but rather on the conduct of the defendant.

Internet Solutions stands for the proposition that the plaintiff should have a logical nexus to Florida, such that it is appropriate that Florida courts resolve the dispute. Being a resident of Florida would certainly establish that nexus. The better analysis is to look at the conduct of the defendant, and then determine if the plaintiff has a rational nexus to the forum state such that it is appropriate that its courts decide the dispute. Dr. Sui brought his case in Florida because he has a longstanding business relationship with the State of Florida.[11] Wu participated as a source for the 20/20 program and certainly knew that this program would impact the current exhibitions, one of which was in Florida.

In Internet Solutions, the Florida Supreme Court went through a lengthy analysis of previous Florida long arm cases. Of the cases reviewed, Renaissance Health Publ'g, LLC v. Resveratrol Partners, LLC, 982 So.2d 739 (Fla. 4th DCA 2008) is particularly instructive. In Renaissance, a Florida corporation sued the nonresident defendants for trade libel for statements made on the defendants' website allegedly disparaging the plaintiff's products. The court held that the statements on the website were tortious acts committed in Florida. The court reasoned that the

---

[10] Following Wu's reasoning, Dr. Sui would never be able to bring an action in this country in any state under any state long arm statute because he would never be a resident of the forum state.

[11] The first three exhibitions for his specimens were held in Florida, and Florida benefitted financially from the revenue and associated taxes generated thereby. In 2008 when the ABC 20/20 show aired, his exhibition was in Fort Lauderdale. Dr. Sui's has contractual relationships with Premier Exhibitions, Inc. ("Premier"), a Florida corporation, and its former President, Arnie Geller, a co-plaintiff in the von Hagens, case who is also a Florida resident. Dr. Sui has a strong and logical nexus to the state of Florida, and as such, the Florida courts are appropriate to resolve this dispute.

defendant's interactive website, which sold products to Florida residents, was essentially a chat room as discussed in <u>Becker v. Hooshmand</u>, 841 So.2d 561 (Fla. 4th DCA 2003).  One of the facts on which the court focused was that the website was interactive and sold products to Florida residents.  See also, <u>Foreign Imported Productions and Pub., Inc. v. Grupo Indus. Hotelero, S.A.</u>, 2008 WL 4724495, at *7-8 (S.D. Fla. 2008).

Cases from other jurisdiction have recognized the power of the interactive internet website and have held that it is <u>not necessary</u> to show that the website was directed to a particular state, as the transmission of the misrepresentation by the website is targeted at all states, and is therefore deemed to have occurred in the forum state.  <u>Telcon Communications v. An Apple A Day</u>, 977 F. Supp 404 (E.D.Va. 1997) (Personal jurisdiction was proper under Virginia's long–arm statute because the defendant advertised and solicited business through the website, which was available to Virginia residents 24 hours a day as a persistent course of conduct.  Posting of press releases constituted regularly doing business in the state as well as committing a tort within the state.  No violation of due process, because the defendant should have reasonably known that the posting of the press releases would have resulted in their dissemination in Virginia).  <u>Digital Equip. Corp. v. AltaVista Technology, Inc.</u>, 960 F. Supp 456 (D. Mass 1997) (Holding personal jurisdiction over a nonresident company whose website was accessible to Massachusetts users.  Defendant's website constituted the transmission of misrepresentations into the state, and hence were deemed to have occurred in Massachusetts.  Defendants took no steps to prevent the alleged infringements from reaching this state's residents).  <u>Inset Systems, Inc. v. Instruction Set, Inc.</u>, 937 F. Supp. 161 (D. Conn. 1996) (Holding that defendant's advertisements on the world wide web were sufficient minimum contacts to warrant personal jurisdiction.  Advertisements, which were available to all the forum state's residents who had internet access, were of a sufficiently repetitive nature to invoke the state's long arm jurisdiction. The internet advertisements were directly aimed at internet users <u>in all</u>

states and therefore constituted a purposeful availment of the privileges of doing business in the forum state.  Due process not violated because of the minimal distance between the defendant's home state and the forum as well as the forum's interest in adjudicating the issues).

The Eleventh Circuit has consistently affirmed the exercise of personal jurisdiction over a non-resident defendant for torts, including defamation, slander and libel, when the injurious material is circulated or published to a third party within the State.  See Madara v. Hall, 916 F.2d 1510, 1515 (11th Cir. 1990); Rebozo v. Wash. Post Co., 515 F.2d 1208, 1212 (5th Cir. 1975); Hoechst Celanese Corp. v. Nylon Engineering Resins, Inc., 896 F.Supp. 1190, 1193 (M.D. Fla. 1995).

Finally, Dr. Sui's injury occurred "in the state of Florida."  As stated by the court in Renaissance Health, the statements on the website were a tortious act committed in Florida, and the injury occurred in Florida.  Furthermore, the Supreme Court has explained in Keeton v. Hustler Magazine, 465 U.S. 770, 775-76 (1984) that tort of defamation is "generally held to occur wherever the offending material is circulated…The reputation of the libel victim may suffer harm even in a state in which he has hitherto been anonymous.  The communication of the libel may create a negative reputation among the residents of a jurisdiction where the plaintiff's previous reputation was, however small, at least unblemished." Id. at 777.

### C.       Exercising Personal Jurisdiction Over Wu Comports with Due Process.

The exercise of personal jurisdiction over Wu comports with due process. When an intentional tort is alleged, as is the case here, a single act, "may support the exercise of personal jurisdiction over the nonresident defendant who has no other contacts with the forum." Seminole Transp. Specialists, Inc. v. PDM Bridge, LLC, 2009 WL 3822773, at *2 (M.D. Fla. 2009).  The Middle District has held that, if "a defendant's tortious conduct is intentionally and purposefully directed at a resident of the forum, the minimum contacts requirement is met, and the defendant

should anticipate being haled into court in that forum." <u>Fidelity Nat. Info. Serv., Inc. v Veen</u>, 2009 WL 3112097, at *5 (M.D. Fla. 2009).  <u>See also</u> <u>Licciardello v. Lovelady</u>, 544 F.3d 1280, 1285 (11th Cir. 2008).

The "minimum contacts" test is satisfied.  Wu published libelous matter over his interactive internet site for the purpose of raising money for Laogai and advancing his personal interests.  His Website is directly aimed at internet users <u>in all states</u> and therefore he has purposefully availed himself of the privileges of doing business <u>in the forum state</u>.  He knew at the time of his ABC interview that Dr. Sui's specimens were in Florida.  In making the due process analysis courts consider: the burden of defending the suit in Florida; Florida's interest in adjudicating the suit; a plaintiff's interest in obtaining effective relief; the interests of the interstate judicial system in using resources efficiently; and the interests of the states in furthering shared substantive policies.  <u>See</u> <u>Posner v. Essex Ins. Co., Ltd.</u>, 178 F.3d 1209, 1221 (11th Cir. 1999).

Wu is not burdened by defending in Florida.  Wu has demonstrated his willingness to travel to Hawaii and Pennsylvania specifically to testify against Dr. Sui.  Wu regularly travels abroad for Laogai.[12]  Florida is convenient to Virginia.  Both Dr. Sui and Wu have a significant interest in resolving this matter in this State.  Wu was fully aware that Dr. Sui's exhibits were displayed in Florida, and that his actions would have a substantial impact in Florida.  <u>See</u> <u>Hakky v. Wash. Post</u>, 2010 WL 2573902, at *6 (M.D. Fla. June 24, 2010).  Moreover, any burden that Wu may suffer in defending this suit in Florida is mitigated by "modern methods of transportation and communication."  <u>Id.</u>; <u>Foreign Imported</u>, 2008 WL 4724495, at *11.  Exercising personal jurisdiction over Wu does not violate due process, because Wu should have reasonably known that the posting of the defamatory articles over the internet would result in their dissemination in Florida.  Wu's Rule 12(b)(2) motion should be denied.

---

[12] According to his Website, he was in Oslo Norway in December of 2010 and spoke to the Taipei International Book Expedition in Taipei on February 8, 2011

### D.      Wu's 12(b)(6) Motion Should Be Denied.

Wu moves this Court under Rule 12(b)(6) to dismiss Dr. Sui's case, asking that this Court

ignore Dr. Sui's well pleaded facts.  To survive dismissal under Rule 12(b)(6), the complaint's

allegations must plausibly suggest that the [plaintiff] has a right to relief."  Brown v. Suncoast

Beverage Sales, LLP, No. 2:09-cv-498-FtM-29DNF, 2010 WL 555675, at *3 (M.D. Fla. Feb. 10,

2010).  When there are well-pleaded factual allegations, a court should assume their veracity and

then determine whether they plausibly give rise to an entitlement to relief. PortionPac Chemical

Corp. v. Sanitech Systems, Inc., 210 F.Supp.2d 1302, 1305 (M.D. Fla. 2002).  The standard "calls

for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of the

claims.  See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (U.S. 2007).

Pursuant to Rule 8(a), Dr. Sui is only required to give "a short and plain statement" of the

claims that will give Wu fair notice of the claims and the grounds upon which they rest.  See

Continental Ins. Co. v. Roberts, 2007 WL 1175760, at *1 (M.D. Fla. Apr. 20, 2007) (citations

omitted); Punta Gorda--Charlotte Harbor Development, LLC v. Allstate Ins. Co., No. 2:08-cv-719-

FtM-29SPC, 2009 WL 3418260, at *2 (M.D. Fla. Oct. 20, 2009) ("Rule 8 does not require a

plaintiff to plead with the greatest specificity it can").  "Although authorized by the Federal Rules of

Civil Procedure, the liberal rules as to the sufficiency of a complaint make it a rare case in which a

motion [to dismiss] should be granted."  St. Joseph's Hosp., Inc. v. Hospital Corp. of America, 795

F.2d 948, 953 (11th Cir. 1986);  U.S. v. Baxter Intern., Inc., 345 F.3d 866, 881 (11th Cir. 2003);

Financial Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276 (11th Cir. 2007) (same); Deaguila v.

Brighthouse LLC, No. 8:10-cv-1058-T-30EAJ, 2010 WL 3340505 (M.D. Fla. Aug. 25, 2010)

(same).  Thus, the standard is not whether the plaintiff will ultimately prevail, but whether the

allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the

allegations. <u>Marsh U.S.A., Inc. v. Walpole, Inc.</u>, 2005 WL 2372006, at *1 (M.D. Fla. Sept. 27, 2005).

Finally, the issues Wu raises in the motion are more appropriate after discovery has taken place. <u>See</u> <u>Twombly</u>, 550 U.S. at 584 (the "simplified notice pleading standard of the Federal Rules relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims…[and] a Rule 12(b)(6) motion is not an appropriate device for testing the truth of what is asserted or for determining whether a plaintiff has any evidence to back up what is in the complaint). Based on the applicable standard, and the simplified notice pleading requirement, Wu's Motion should be denied in its entirety. Wu's disputed facts and misdirected legal arguments will be addressed in the order presented.

### 1.      The Premier Stipulation Does Not Bar Dr. Sui's Action.

Wu first contends that Dr. Sui's case must be dismissed at the pleading stage because of a stipulation between Premier and the New York Attorney General. At the outset, the statement is <u>not made by Dr. Sui</u> and is not binding on him. The statement simply says that "<u>Premier</u> [not Dr. Sui] cannot <u>independently verify</u> that the human remains you are viewing are not those of persons who were in Chinese prisons." This is simply "evidence" that Wu may attempt to use at trial. It is not an admission of fact from Dr. Sui, nor is it determinative of Dr. Sui's independent proof of the origins of his specimens.[13] Furthermore, it does not defeat Dr. Sui's pleadings, nor does it address the heart of the libel in this case. Wu was given nine photographs from von Hagens, and Wu falsely stated that <u>the bodies shown in those photographs</u> were purchased by Dr. Sui (Am. Comp. ¶¶15c, 15d, 16a, 16b, 19, 20) and used in Dr. Sui's exhibits. The Premier stipulation does not "defeat" this false statement. At best, the Premier stipulation is simply rebuttable evidence.

---

[13] The key words in the statement are "independently verify." The Attorney General insisted that Premier verify the donors for all of the specimens without relying on submissions from Dr. Sui. Under the threat by the Attorney General of closing Premier's exhibit, the Attorney General and Premier reached an agreement on the stipulation.

**2.      Wu's Statements to the Legislatures Are Not "Absolutely" Privileged.**

Wu's next argument is that his statements in Hawaii and Pennsylvania are "absolutely privileged" and thus the complaint must be dismissed.  From the outset, even if discovery proves that Wu's statements meet the requirements of an "absolute privilege," the complaint will not be dismissed.  Dr. Sui does not rely solely on the statements made before these bodies for his cause of action.  Specifically, the July 12, 2010 article and the other numerous statements are actionable, without consideration of the Hawaii and Pennsylvania testimony.

From the outset, Wu's testimony in Pennsylvania is obviously not about human rights.  He was testifying to attack and damage the reputation of Dr. Sui.  His words do not go to the issue of whether the persons in the body exhibits have given their consent to have their bodies plasticized or whether human bodies should be displayed in this manner.  Rather, his accusations are that Dr. Sui illegally purchased the bodies of executed prisoners who were grossly mistreated, and used them in his exhibitions.  Secondly, Wu's words are patently false and are made with actual malice.  Now that Wu has seen the Sun testimony, Wu knows that his statements were false.  Here is what Wu said in Pennsylvania on Aug. 5, 2008, within the two year limitations period, as extended:

> The first pictures four cadavers.  The head was shot, bloody. There was cover by the plastic. The leg, the hand, was still tied.  The doctor tried to take away the class. Who take this photo? We know his last name.  We know who is ABC 20/20 program producer, Ronald Ross.  Ron Ross went to China and interview the guy, but he said keep me in secret.  So they have this photo from the back.  But they knew he working with Dr. Sui about four years.  He come back more than 100 to 120 cadavers all of the country and pass over to the doctor.  … They have the hole in the face, the bullet from the back to the face.  And he is ready for plastination. … But the person who collect these cadavers is working for Dr. Sui and plastinated.

Before an "absolute privilege" can apply to testimony before legislative bodies, Wu must prove that his testimony was given under oath and under the compulsion of a subpoena.  He must also demonstrate that his testimony was not for his personal attack on the plaintiff, but was to

further the purposes of the legislative function.  Wu has offered nothing to show that his

"testimony" would be granted any such privilege.

In <u>Fiori v. Rogero</u>, 144 So.2d 99 (Fla. DCA 2nd, 1962), the Florida court of appeals

addressed the issue of privilege.[14]  In doing so, it stated:

> In the United States, according to the overwhelming weight of authority, in order
> that defamatory words, published by parties, counsel, or witnesses in the due course
> of a judicial procedure, may be absolutely privileged, they must be connected with,
> or relevant or material to, the cause in hand or subject of inquiry. If they be so
> published and are so relevant or pertinent to the subject of inquiry, no action will lie
> therefor, however false or malicious they may in fact be. * * * The ends of justice
> can be effectually accomplished by placing a limit upon the party or counsel who
> avails himself of his situation to gratify private malice by uttering slanderous
> expressions and making libelous statements, which have no relation to, or connection
> with, the cause in hand or the subject-matter of inquiry. The person whose good
> name suffers has, or ought to have, the right to vindicate his reputation by an appeal
> to the courts, instead of taking the law into his own hands. <u>Fiori</u> at 102.

The court in <u>Fiori</u> went on to state that the "existence or nonexistence of such malice, where the

facts are controverted, and there is evidence upon the subject, is a question of fact for a jury.  <u>Fiori</u>

at 103. In <u>Fiori</u>, the court held that the privilege was "qualified" (not absolute) as the witness was

appearing voluntarily without subpoena.  Thus, at the pleading stage, the statements are actionable.

It is up to Wu to demonstrate that these malicious statements meet the requirements for absolute

privilege.

### 3.   The Statements Made in the July 12, 2010 Observe China Article Are Not Time Barred.

Wu's next argument is that the false statements made in the July 12, 2010 article are time

barred.  The article is attached to the Amended Complaint as Exhibit 3 and is referenced at ¶16a-c.

It contains false statements about Dr. Sui.  It is <u>not</u> the same article published the same day that the

ABC 20/20 show aired on February 15, 2008.  As set forth in detail in Section A1 to this brief, the

---

[14]  Florida substantive law, not Pennsylvania law, governs this issue.  Under the doctrine enunciated in *Erie*
and its progeny, "federal courts sitting in diversity apply state substantive law and federal procedural law." <u>Gasperini v.
Center for Humanities, Inc.</u>, 518 U.S. 415, 427 (1996).

article makes a number of false and misleading statements. One picture in the article contains the caption, "Bodies of executed prisoners delivered to a plastination factory in Jilin, China. The anonymous source [Sun Deqiang] of these photographs also claimed to have delivered bodies to Premier's supplier [Dr. Sui] in Dalian, China." Of course, these bodies were never delivered to Dr. Sui, and Sun has now testified by deposition that the bodies were never delivered to anyone. (Exhibit 9, pp. 37, 66, 69-72). The article contains fourteen references to matters occurring after the February 15, 2008 article. (Am. Comp. ¶17). The statements were made well within the two year statute of limitations and are actionable.

### 4. Dr. Sui Has Demonstrated that the Statements Are False.

Wu's next argument is that under <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009), Dr. Sui cannot prove that Wu's statements are false. Although not required to do so at the pleading stage, Dr. Sui <u>has proven</u> that the statements are false. Dr. Sui has provided Wu with Sun's testimony which retracts anything that Wu could possibly rely on in making his false statements. Dr. Sui has specifically alleged that he has not purchased bodies of executed prisoners and that he has not displayed executed prisoners in his exhibits. These are statements of fact, not legal conclusions, and the fact that they are statements concerning negative matters i.e, matters that never occurred, do not make the statements legal conclusions.[15] Wu will certainly have the right to cross-examine Dr. Sui on these allegations, but at the pleading stage, Dr. Sui's unequivocal statement that he "never" performed an act is sufficient. This is simply a statement of conduct. In addition, Dr. Sui's pleadings are well supported by Sun's testimony. Sun's testimony is unequivocal that Dr. Sui <u>did</u>

---

[15] Ironically, it is Wu who supports his motion with the legal conclusion at ¶4 of his Affidavit that he has not conducted business in Florida. (Wu Aff, ¶4). The "conduct of business" is a legal term and is a conclusion that can only be reached based on specific facts. To support his legal conclusion that he has not conducted business, Wu will have to make negative statements of fact, such as "I have not traveled to Florida," etc., which he contends are not appropriate for pleadings.

not purchase the bodies in the pictures, and that these bodies were never delivered to Dr. Sui or his companies. Wu chose not to participate in Sun's deposition and question Sun on these issues.

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (U.S. 2007) specifically explains that "a complaint attacked by a motion to dismiss for failure to state a claim upon which relief can be granted does not need detailed factual allegations" but, rather, only requires "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." 550 U.S. at 554-56. Iqbal further explains that "[a] complaint has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. 129 S. Ct. at 1949; see also Twombly, 550 U.S. at 1965 ("a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of facts is improbable and 'that recovery is very remote and unlikely'"). Dr. Sui's Amended Complaint sets forth the substance of the defamatory statements in great detail. At this stage of the litigation, Plaintiffs have met the Twombly and Iqbal pleading requirements.[16]

**5. Dr. Sui Is Not a Public Figure, But Has Sufficiently Pled Actual Malice.**

Dr. Sui is not a public figure, although Wu has done everything possible to make him one. Finding one quote in a 2005 Orlando newspaper article does not "insert one into the public debate" and make one a public figure. (Wu's brief, p. 16). See, Gertz v. Robert Welch, Inc. 418 U.S. 323 (1974). Indeed, in 2005 there was no public debate as the 20/20 program was years away, and Wu had not made his defamatory statements about Dr. Sui. Likewise, Dr. Sui is not a limited public figure (one who has thrust himself to the forefront of particular public controversy in order to influence the resolution of the issues involved) 418 U.S. at 345, 94 S. Ct at 3009. Regardless of this

---

[16] The law is clear that a defamation claim can be pled generally, so long as it meets the requirements of Rule 8(a). See Holtzman v. B/E Aerospace, Inc., 2008 WL 214715, at *2 (S.D. Fla. June 24, 2008).

Court's view of Dr. Sui's status, however, Dr. Sui has sufficiently pled actual malice.  Actual malice is shown when a libel plaintiff shows that the defendant acted "with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times v. Sullivan, 376 U.S. at 279-80.  Acting on pictures given to him by von Hagens, known to Wu to be Dr. Sui's bitter competitor, and making no further inquiry or investigation, Wu clearly acted with "reckless disregard" for the truth.  See Am. Complaint, ¶¶22, 24, 26, 27, 28, 31, 34 and 35.[17]

### 6.  Dr. Sui's Remaining Allegations of False Statements Are Actionable.

At page 19 of his brief Wu sets forth a chart and attempts to parse various allegations of Dr. Sui's complaint, either contending that the statements do not concern the plaintiffs, are not plausible, are not defamatory, or lack factual allegations.  In each instance, Wu takes the allegation of the complaint completely out of context.  For example, ¶16(a) states in part that "The secret witness supplied Dr. Sui with more than 100 to 120 cadavers obtained from all over China."  This statement was made by Wu in the context that the secret witness (Sun) was illegally selling bodies of executed prisoners in the body black market and sold bodies to Dr. Sui, which of course, never happened.  Wu's response to this statement is that there is nothing "improper" about "supplying or obtaining bodies."  Perhaps taken in a vacuum, this might be true, although purchasing bodies in China is illegal. (Exhibit 9, p. 72).  In the context of Wu's attack on Dr. Sui,  alleging that Dr. Sui purchased executed prisoners in an illegal body black market, from a "secret person," and then used these bodies in his exhibitions, the statement is both actionable and malicious.

The second statement ¶16(b) is even more disingenuous.  Not only did Wu accuse Dr. Sui of buying executed prisoners in a black market, but he stated that the secret person supplying the bodies worked for Dr. Sui.  At the time that Sun made the pictures, and appeared on the 20/20 show,

---

[17] Wu's claim that he relied on the ABC 20/20 program as a reputable news report to justify his actions is completely disingenuous.  Wu was a source for the ABC program.  Furthermore, Wu points to absolutely nothing in the transcript of the 20/20 program that justifies his statements. (See transcript of the 20/20 show attached as Exhibit 4 to the Am. Complaint).

he was <u>working for von Hagens</u>. Sun has never worked for Dr. Sui. (Exhibit 9, pp. 26, 37). Wu's purpose in making the statement was to falsely state to the public that Dr. Sui had his own secret person traveling throughout China illegally purchasing the corpses of executed prisoners, so that he could use them in his exhibits. The statement is completely libelous. Wu's response in support of the alleged truthfulness of this statement is that there is nothing wrong with a person working for another person! Even the holdings in <u>Twomble</u> and <u>Iqbal</u> were never intended to support such a tortured analysis as set forth in Wu's chart. The standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of the claims. <u>See</u> <u>Bell Atlantic Corp.</u> <u>v. Twombly</u>, 550 U.S. 544, 556 (U.S. 2007). Dr. Sui has more than met this standard.

### 7. Dr. Sui's Count for Tortious Interference Is Sufficiently Pled.

To state a valid claim for tortious interference with a contract or business relationship, Plaintiffs must allege: (1) the existence of a business relationship between Plaintiffs and a third person, not necessarily evidenced by an enforceable contract, under which Plaintiffs have legal rights; (2) Wu's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by Wu which induces or otherwise causes the third person not to perform; and (4) damage to Plaintiffs resulting from the third person's failure to perform. <u>See</u> <u>Stewart Title Guar.</u> <u>Co. v. Title Dynamics, Inc.</u>, 2005 WL 2548419, at *3 (M.D. Fla. Oct. 11, 2005).

Dr. Sui is not required to "prove that a contract would have been reached or extended by the exercise of options with his business partner had Wu not interfered." <u>International Sales & Service,</u> <u>Inc. v. Austral Insulated Products, Inc.</u>, 262 F.3d 1152, 1156-57 (11th Cir. 2002); <u>Ethan Allen, Inc.</u> <u>v. Georgetown Manor, Inc.</u>, 647 So.2d 812 (Fla. 1994) (Plaintiffs "may properly bring [a] cause of action alleging tortious interference with present or prospective customers"). Nor does a claim for tortious interference have to be pled with specificity. <u>See</u> <u>Bray & Gillespie Management LLC v.</u> <u>Lexington Ins. Co.</u>, 527 F.Supp.2d 1355, 1368 (M.D. Fla. 2007).

The Complaint specifically alleges that Plaintiffs had an existing business relationship with Premier, and that due to the damages caused by Wu's false statements, Premier elected not to exercise three contract options for Dr. Sui's specimens.  Taken as true, these allegations are sufficient to state a cause of action. (Am. Comp. ¶50).  See, <u>Emdeon Practice Services, Inc. v. Final Support, Inc.</u>, 2006 WL 3097281, at *1 (M.D. Fla. Oct 31, 2006); <u>Future Tech Intern., Inc. v. Tae Il Media, Ltd.</u>, 944 F.Supp. 1538, 1570 (S.D. Fla. 1996).

### 8.  Dr. Sui's Count for Equitable Relief is Adequately Pled.

It is well within this Court's power to enjoin Wu from continuing to publish the false information on his Website, because Dr. Sui has made concurrent claims for tortuous interference with his business relationships.  See, <u>Murtaugh v. Hurley</u>, 40 So.3d 62 (Fla. Dist Ct. App. 2010) recognizing that it is appropriate to enjoin a person from making defamatory statements as long as there is an independent ground for doing so, such as a claim for "interference with a present or prospective business relationship." Citing <u>DeRitis v. AHZ Corp.</u> 444 So.2d 93, 94 (Fla. 4th DCA 1984).  Wu has confused the specific relief sought in Count III of Dr. Sui's complaint (the injunction to prohibit Wu's continued false statements on his Website) with the appropriateness of this relief.  As long as there is an independent ground for invoking equity (the interference claim), the injunction can issue to enjoin the continuing defamation.  Count II of Dr. Sui's Amended Complaint seeks damages for the interference claim.  Count III seeks the injunction.  The cause of action in Count II (previously pled) makes the equitable remedy in Count III appropriate.  It is not necessary that Dr. Sui re-plead Count II into Count III to support his claim for an injunction (although Count III is incorporated at ¶51).

### III.  <u>CONCLUSION</u>.

Wherefore, Dr. Sui respectfully requests that the Motion to Dismiss be denied in its entirety.

Respectfully submitted, this 8th day of March, 2011.

*/s/ Ezra B. Jones, III pro hac vice*
William J. Schifino, Jr., Esq.
Florida Bar No. 564338
Daniel P. Dietrich, Esq.
Florida Bar No. 934461

Williams Schifino Mangione & Steady, P.A.
201 N. Franklin Street, Suite 3200
Tampa, FL 33602
(813) 221-2626 (telephone)
(813) 221-7335 (facsimile)
e-mail: wschifino@wsmslaw.com
e-mail: ddietrich@wsmslaw.com

Ezra B. Jones III, Esq. (admitted pro hac vice)
Pendergast & Jones, P.C.
115 Perimeter Center Place
Suite 1000 South Terraces
Atlanta, GA. 30346
(770) 392-0303 (telephone)
(770) 392-0909 (facsimile)
e-mail: ejones@penderlaw.com
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on March 8, 2011, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants. I further certify that I will mail the foregoing document and the notice of electronic filing by first-class mail to any non-CM/ECF participants.

*/s/ Ezra B. Jones, III pro hac vice*
Ezra B. Jones III, Esq. (admitted pro hac vice)
Pendergast & Jones, P.C.
115 Perimeter Center Place
Suite 1000 South Terraces
Atlanta, GA. 30346
(770) 392-0303 (telephone)
(770) 392-0909 (facsimile)
e-mail: ejones@penderlaw.com